**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 5:20-CV-077 |
| | § | |
| 3.817 ACRES OF LAND, MORE OR | § | |
| LESS, SITUATE IN ZAPATA COUNTY, | § | |
| STATE OF TEXAS; AND ZAPATA COUNTY | § | |
| | § | |
| *Defendants.* | § | |

---

**REPLY TO DEFENDANT'S RESPONSE TO OPPOSED MOTION OF THE UNITED
STATES OF AMERICA FOR ORDER OF IMMEDIATE POSSESSION**

---

1.  The United States respectfully submits this Reply to Defendant's Responses to Plaintiff's

    Motion for Possession. On July 29, 2020, the United States submitted its Opposed Motion

    for Order of Immediate Possession. (Docket No. 10). On August 31, 2010, the defendant

    filed an opposition to plaintiff's motion for possession. (Docket No. 19). Zapata County's

    response seems to conflate the right of entry (ROE) with a fee declaration of taking (DT).

    The response premises the majority of its arguments on the idea that should the Court grant

    the US the ROE, it has essentially green lit the construction of the wall. This condemnation

    is only to permit surveyors, appraisers and soil testers onto the property and in no way

    permits any construction of the wall. Any construction could only occur after a separate

    lawsuit and condemnation. The County's arguments, to the extent they are legally

    cognizable, are premature and not yet ripe. Nothing will be constructed as the result of the

    court granting the United States the right of entry for surveying. The United States does

not and will not have the legal authority to construct anything on this tract of land as a result of this condemnation. Further, Zapata County's attempt to delay by abating this suit pending the *Zapata County v. Trump* suit is simply a stall tactic. The *Zapata County v. Trump* suit involves construction of the wall and the United States asks the court to take judicial notice of the arguments raised in the motion to dismiss, which will be filed shortly. There is no reason to delay survey and appraisals as this suit does not involve actual construction of the fence.

**FARALLON ISLAND FOUNDATION IS NOT A REQUIRED PARTY.**

2. In federal condemnation proceedings, courts look to state law in resolving the nature of property rights acquired. *See United States v. Causby*, 328 U.S. 256, 266 (1946); *TVA v. Powelson*, 319 U.S. 266, 279 (1943); *United States v. 0.073 Acres of Land* (*Mariner's Cove*), 705 F.3d 540, 544 (5th Cir. 2013); for more cases (and discussion), see *Uniform Appraisal Standards for Federal Land Acquisitions* (*Yellow Book*) pp. 90-91 & nn. 182-184 & cases cited therein.   *Everything* else is governed by federal law. Under Texas state law, "realty does not revert where the use specified in the deed is discontinued solely because of a taking under the power of eminent domain." *City of San Antonio v. Ruble*, 453 S.W.2d 280, 282-283 (Tex. 1970). In other words, the Supreme Court of Texas has already specifically rejected the landowners' argument that a condemnation could cause a reversion. Since the condemnation cannot cause a reversion, Zapata County will not lose the Bird Sanctuary, *see Ruble*, and therefore will not suffer the claimed undue hardship. *See* County Resp. at 10 ("The loss of the Bird Sanctuary will cause Zapata an undue hardship."). Farallon has no interest in the limited property interest acquired here--a

temporary right of entry--and therefore, correctly, is not named as a party in this proceeding. *See Ruble*;

3. By the terms of the deed, a mere temporary easement to survey, appraise and soil test, does not invoke the reversionary clause. The county can still use the property as a wildlife refuge and sanctuary for birds and bird watchers. Nothing about the temporary easement prevents that use.

4. The county argues that, because the land at issue was gifted to the county under the condition that it vests with the Farrallon Island Foundation should the land cease to be used as a wildlife sanctuary, "a temporary easement over the bird sanctuary permitting contractors to conduct surveys, make borings, and conducting other undefined investigations on the tracts of land, along with the right to trim and remove any vegetative or structural obstacles on the properties that interfere with the aforementioned purpose and work is likely to terminate the interest in the bird sanctuary held by Zapata County." Response at 10. There are two problems with this argument. The first is that the United States already has legal title to the easement at issue. The United States acquired legal title to the easement the moment it deposited its estimate of just compensation with the Court. Under the DT Act:

on filing the declaration of taking and depositing in the court, to the use of the persons entitled to the compensation, the amount of the estimated compensation stated in the declaration – (1) title to the estate or interest specified in the declaration vests in the Government; (2) the land is condemned and taken for the use of the Government; and (3) the right to just compensation for the land vests in the persons entitled to the compensation.

40 U.S.C. § 3114(b). Accordingly, "[t]itle and right to possession thereupon vest immediately in the United States" after the filing of a Declaration of Taking and deposit of estimated just compensation. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 4 (1984). *See also East Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 825 (4th Cir. 2004) ("In a [DT Act] case the government exercises its right to immediate possession with minimal judicial oversight. Title and the right to possession vest in the government immediately upon the filing of a declaration and the requisite deposit.").

Zapata County contends that ownership of the tract may vest with the Farallon Island Foundation should the court grant the pending motion. However, the County does not seem to understand that the United States has legally already acquired title to the easement. Regardless of whether the court grants possession, the United States already has legal title to the easement pursuant to the DT Act. If the United States' acquisition of that easement was enough to cause the property to revert back to the Farallon Island Foundation, as the county seems to argue is the case, the vesting of title in Farallon would have already taken place when the United States deposited its estimate of just compensation. However, there is no sign that such a transfer has taken place. In fact, the County's entire argument is premised on its belief that it currently has title to the property. The mere fact that the county still believes it has title to the property is proof enough that is argument is without merit. If the mere right of entry was enough to invoke the reversionary clause, Zapata County no longer has standing to advance any of the arguments they make.

Secondly, assuming for a moment that title had not already vested in the United States, or that the court's granting the United States possession of the ROE somehow had

an impact on that title, the County offers nothing to suggest that a team of surveyors entering onto the property would somehow make it unusable as a bird sanctuary.

**UNITED STATES NOT REQUIRED TO SHOW TIME IS OF THE ESSENCE**

5. The United States is not required to show that time is of the essence, but states so as it is common knowledge within the community that the contractors for survey , appraisal, soil testing, and environmental review are already working in Webb County. Attached hereto as Exhibit 2 is the declaration of Loren Flossman, that evidences that contractors are already working on surveys, appraisals and soil testing in Webb and Zapata counties. The county cites case law that the court's power to review is limited to government officials making an administrative decision in bad faith or so capriciously and arbitrarily that their action was without adequate determining principle or was unreasoned. The fact that the contractors are under contract and working in the county refutes any argument that the motion is in bad faith or arbitrary and capricious.

**UNITED STATES HAS MET ALL OBLIGATIONS TO CONSULT UNDER IIRIRA § 102**

6. Zapata County's continued argument that the United States did not engage or make any attempt to negotiate is conceivably a Rule 11 violation. Not only did Border Patrol and the Army Corp of Engineers engage in negotiations as evidenced by the motion for possession, but AUSA Paxton Warner at the community meeting met with the Zapata County Judge and assisted in answering all questions that were raised at the meeting. Further, AUSA John Smith conferred with the Zapata County Attorney on more than one occasion and explained not only the ROE process, but the subsequent fee taking process, the effects of a potential fence on the county water pump station, access through the fence if one is built

*Opposed Motion for Possession*

and all other questions the county attorney posed. AUSA Smith was told by the county attorney that due to the politics of the matter, the county could not sign the ROE. AUSA Smith informed the County Attorney that he would need to file a DT for the easement and the county attorney acknowledged that he understood that AUSA Smith had to do so.

7. It is ironic that Zapata refers to the Judge Hanen opinion in *The United States of America v. 1.04 acres of land, 538 F. Supp. 2d 995*, because AUSA Smith adopted a policy that AUSA's would also meet and confer with all landowners before filing a DT for ROE to ensure that the landowner knew what to expect in the coming proceeding and to answer any questions they may have about the ROE process or any future process, largely due to Judge Hanen's expectations. As Judge Hanen said, "The Government is required to put forth a bona fide effort to determine whether an agreement can be reached." *Id.* at 1012. Not only did the County Judge tell Border Patrol and the Army Corp that he would not sign an ROE, the County Attorney told this AUSA that the county would never sign an ROE and realized that AUSA Smith would then need to file a declaration of taking. At no time, did the county raise the estimated just compensation as an issue, nor did they counter the $100.00 deposited with an amount for just compensation.

8. As noted by Judge Hanen, "The savings provision states that the consultation clause does not create any right of action nor does it affect the eminent domain laws of the United States." *Id.* at 1013. As can be ultimately seen in the opinion, the court ruled against the landowner regarding the use of the Declaration of Taking act and failure to comply with the consultation clause and ordered the parties to negotiate or provide the court with evidence of bona fide efforts to negotiate. *Id.* at 1015. When the landowner tells the AUSA

that they will never sign the ROE for political reasons, the United States is unable to negotiate any further and has made bona fide efforts to negotiate.

**UNITED STATES DID OFFER AND FILE JUST COMPENSATION**

9. Defendant has improperly conflated the issue of the United States' request for access to conduct surveying and other testing on the subject property with the United States' potential intent to take the property by connecting the request to complete a site assessment and surveys with a contract for construction.

10. The Consolidated Appropriations Act of 2018 provides the U.S. Customs and Border Protection (CBP) with, among other appropriations, $38,000,000 for border planning and design. The Consolidated Appropriations Act, 2018, Pub. L. 115-141, div. F, tit. II, 132 Stat. 348, 607 (2018) ("2018 DHS Appropriations Act") Schedule A of the Declaration of Taking, identifies the 2018 DHS Appropriations Act as the authority providing funds for the acquisition of the estate sought by the United States in this case. (Schedule A, Docket No. 2). Further, the uses stated in Schedule B of the Declaration of Taking are surveys, testing and other investigatory work to be used to plan for construction of different types of specified infrastructure. (Schedule B, Docket No. 2). Therefore, in the 2018 DHS Appropriations Act, funds have been appropriated and made available to the United States for "border barrier planning and design" and these funds are being duly used by the United States for the taking of this estate to permit surveys, testing and other work needed to plan and design border barrier infrastructure. Zapata County mistakenly argues that the 2108 appropriations do not specifically mention Webb or Zapata County. The appropriations bill awards DHS thirty-eight million dollars for border barrier planning and design, with no

geographical limitation. The 2020 appropriation for construction is the bill that specifically provides fencing appropriations.

11. Defendant asserts in their response that they should be allowed to argue legal issues for which they have no standing yet to argue. Defendant goes on to assert what they will argue when and if the United States files a condemnation action to acquire a fee estate. At this time, there remains a possibility that once the United States is granted access to the property, it may conclude that it will not construct infrastructure on the property, as the surveys and other testing may prove the property is not suitable for the needs of the United States. This determination requires access to the subject property.   At this point, Defendant's assertions regarding future construction are irrelevant and not ripe.

12. To the extent Defendant challenges the authority of the United States to carry out construction of a border barrier and other infrastructure on the subject property, such a challenge is premature and not ripe. Additionally, it is not relevant to the temporary, non-exclusive interest that is the subject of the taking in this case. In the event the United States determines, after surveying, planning and design work has been completed, that it requires a permanent real estate interest over a portion of the subject property, it will do so in a separate action. However, in the current case pending before this Court, the United States has not sought to acquire such an interest in the subject property, but is merely seeking a temporary, limited interest to carry out planning and design activities using funds that Congress appropriated for this purpose.

13. Defendant further purports that the United States has not "made a bona fide effort to negotiate with Zapata County." This is factually false.   The United States directs the Court to paragraph 15 of the Joint Case Management Plan and paragraph IV of the Motion for

Possession and paragraph 7 above, which details undersigned counsel's good faith negotiations with the Defendant. (Docket No. 10 & 12).

14. The authority for the United States to acquire access to the subject property is clearly stated in Schedule A of the Declaration of Taking (Docket No. 2). Further, the United States is entitled to the entry of an order of immediate possession giving the United States possession of the temporary estate described in Schedule E of the Declaration of Taking. (Docket No. 2).

15. In opposition to the United States' Motion, Zapata County argues that the United States has failed to engage in good faith pre-condemnation negotiations because it did not obtain a separate appraisal for the temporary right of entry to survey, which has no measurable market value. The guidelines set forth in 42 U.S.C. § 4651 are not mandatory. Any alleged failure to follow these policy guidelines therefore cannot prevent the United States from obtaining possession of the temporary right of entry to survey. And even if these guidelines were mandatory, which they are not, the United States did not fail to negotiate in good faith.

16. Further, and contrary to Zapata County's ultimately unsupported assertions, these types of temporary rights of entry have no measurable market value. This lack of measurable market value is attributable to the limitations of this temporary right of entry to survey, which do not change with, or because of, the characteristics of the property over which this temporary easement is obtained. In short, analyzed using proper appraisal methodology, the right of entry at issue does not have any measurable market value, and the nominal $100 in estimated just compensation the United States has deposited more than compensates for this limited right of entry.

17. As part of its Declaration of Taking filed with the Court on May 7, 2020, the United States identified the estates taken in the Subject Property. *See* ECF No. 2-1. (Schedule E). Here, the United States acquired a limited, temporary, easement authorizing it to enter Zapata County's property to:

Enter in, on, over and across the land described in Schedule C to survey, make borings, and conduct other investigatory work [needed to plan the proposed construction of roads, fencing, vehicle barriers, security lighting, camera, sensors, and related structures designed to help secure the United States/Mexico border within the State of Texas]… including the right to trim or remove vegetative or structural obstacles that interfere with said work . . .

Schedule E to Declaration of Taking. ECF No. 2-1. The estate taken has a 12-month term. *Id*. The landowner retains "all right, title, and privileges as may be used and enjoyed without interfering with or abridging the rights" specified above. *Id*.

18. The temporary estate acquired is limited in scope and duration and, as noted above and explained in more detail below, has no measurable market value. Rather than give the landowner no compensation, the United States determined, as an administrative matter, that $100 accurately represents the nominal value of the acquired estate. In addition to this nominal $100, the United States' estimate of just compensation includes "an additional sum determined at the conclusion of the temporary estate described in Schedule E to constitute actual damages, if any." ECF No. 2-1 (Schedule F).[1] Accordingly, the United States offered Zapata County $100 for the temporary right of entry to survey. Further, as a result of its determination that temporary rights of entry to survey have no measurable

---

[1] The United States has no expectation that it will harm the subject property in any way when it exercises the minimally intrusive right of entry to survey the subject property. In the unlikely event that Zapata County comes to believe the United States has done so, the Declaration of Taking specifically provides for actual damages to be paid to them. They may submit an administrative claim to the nearest Customs and Border Patrol location, or they may pursue a future claim under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (2013), or an inverse taking claim before the United States Court of Federal Claims.

market value, the United States never received a demand from Zapata County for an amount of just compensation.

19. The United States deposited $100 as the estimated just compensation in this case on May 13, 2020 (ECF No. 5), at which time the right to possess and utilize this temporary right of entry vested with the United States.  40 U.S.C. § 3114(b).  Zapata County nevertheless opposes the right of the United States to possess this temporary right of entry to survey the property.

**The Right To Possession Has Vested In The United States**

20. As a preliminary, but fundamentally important, matter, the right to possess the temporary right of entry to survey the United States has acquired here vested with the United States on May 13, 2020.  As the United States explained in its Motion, the right to possession by the United States of property interests acquired pursuant to the Declaration of Taking Act ("DT Act"), 40 U.S.C.  3114, vests upon deposit of the estimate of just compensation. Under the DT Act:

on filing the declaration of taking and depositing in the court, to the use of the persons entitled to the compensation, the amount of the estimated compensation stated in the declaration – (1) title to the estate or interest specified in the declaration vests in the Government; (2) the land is condemned and taken for the use of the Government; and (3) the right to just compensation for the land vests in the persons entitled to the compensation.

40 U.S.C. § 3114(b).  Accordingly, "[t]itle and right to possession thereupon vest immediately in the United States" after the filing of a Declaration of Taking and deposit of estimated just compensation.  *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 4 (1984).  *See also East Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 825 (4th Cir. 2004) ("In a [DT Act] case the government exercises its right to immediate possession with

minimal judicial oversight.  Title and the right to possession vest in the government immediately upon the filing of a declaration and the requisite deposit.").

21. Zapata County may dispute the amount of just compensation the United States has estimated is due here, but this dispute does not defeat the United States' right to possession under the DT Act.  Rather, and although the United States strongly disputes that the temporary right of entry it has acquired has any measurable market value, Zapata County retains the ability to seek an amount in excess of the estimated just compensation deposited with the Court as this litigation progresses.  *See* 40 U.S.C. § 3114(c) ("Compensation shall be determined and awarded in the proceeding and established by judgment.").  Nor do the arguments Zapata County raises in opposition to the United States' Motion defeat, for the reasons explained in greater detail below, the United States' statutory right to immediately possess the temporary right of entry to survey it has acquired.  Accordingly, the United States respectfully requests that the Court grant it possession of the temporary right of entry to survey.

**The United States Has Not Failed To Comply With Any Requirements Necessary To Its Exercise Of Its Power Of Eminent Domain**

22. Read in its entirety, Section 4651 makes clear that its subparagraphs are policies that provide guidance to Federal agencies in their acquisition of real property.  This provision begins by stating that, "heads of Federal agencies shall, to the greatest extent practicable, be guided by the following policies."  42 U.S.C. § 4651.  Moreover, 42 U.S.C. § 4602 expressly states that "[t]he provisions of section 4651 of this title create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation."  The Fifth Circuit Court of Appeals further has affirmed that these

provisions are guidelines only, and not mandatory requirements imposed upon the United States. *United States v. 320.0 Acres of Land, et al.*, 605 F.2d 762, 822 n.134 (5th Cir. 1979) ("the provisions of § 4651 are hortatory guidelines and not enforceable mandatory requirements"). Any alleged failure to follow these policy guidelines cannot prevent possession.

23. Likewise, Zapata's reliance on the OIG report is misguided. The OIG report is not law nor even policy. It has no effect on the United States' ability to condemn land. The report is not even adopted by the Secretary of the agency that issued the report and is in fact disputed.

24. Zapata also argues that the United States has failed to engage in bona fide pre-condemnation negotiations required by 8. U.S.C. § 1103(b), asserting that the United States has not engaged in good faith negotiations because it "arbitrarily" determined that the temporary right of entry to survey has no measureable market value, and offered a "sham" offer and estimate of just compensation of $100.

25. The Immigration and Nationality Act, 8 U.S.C. § 1103, permits the Attorney General to acquire property to secure the United States' international border when the United States and the owner of the property in question "are unable to agree upon a reasonable price." In *United States v. 0.35 Acres of Land, More or Less, Situate in Hidalgo County, State of Texas, et al.*, Judge Andrew Hanen explained, "that the pre-possession effort to negotiate [pursuant to Section 1103(b)] should include at a minimum: the identity of the parties, location of the property, a description of the interest sought, and the price to be paid for that interest." Case No. M-08-023 (S.D. Tex.), Order dated April 3, 2008 at 4. Zapata

does not claim that the United States has failed to identify these items in its communications with them.   Instead, they object to the price the United States has determined it is willing to pay for a temporary right of entry that has no measurable market value.  *Id.* at 7.

26. As explained in detail below and in the declaration of Mr. Roger Jennings attached hereto as Exhibit 1 (this declaration was filed in a separate Laredo ROE suit), the United States' determination that temporary rights of entry to survey have no measurable market value, and that $100 justly compensates for this limited right, is neither arbitrary nor a "sham." The United States offered Zapata the same nominal $100 it has offered other landowners for this limited right of entry.  Zapata County has not made a demand beyond the $100 and the declaration of Chance Bolton is self-defeating. Mr. Bolton states in his declaration, "Though evidence of market transaction for rights-of-entry for survey inspections **may not be readily available (and I have not researched such, at this time**), similar limited duration right exchange examples do exist (emphasis added)."   In other words Bolton has no knowledge regarding values for rights of entry and Bolton does not know of any markets acknowledging same exist.  The United States made its best offer from the beginning, and received no counter offer – such action means that the United States was acting in good faith.  *United States v. 1.04 Acres of Land, More or Less, Situate in Cameron County, Texas*, 538 F.Supp.2d 995, 1010 (S.D. Tex. 2008) ("The negotiation condition may also be satisfied where the owner is willing to sell only at a price which the condemning party deems excessive.  If it becomes apparent that no agreement can be made at a price satisfactory to the condemning party, the condemnor need not make any further effort to reach an agreement.*") (internal citations omitted).  See also, Constitution Pipeline Co.,*

*LLC v. A Permanent Easement for 0.25 Acres*, 2015 WL 12564217, *2 (NDNY Feb. 24, 2015) (stating, in a discussion of good faith negotiations pursuant to the Natural Gas Act, 15 U.S.C. § 717f, that "[d]efendant's disagreement with plaintiff's valuation and his reservations about the pipeline itself do not militate against a finding of good faith, nor does plaintiff's alleged statement that if defendant did not accept plaintiff's offer, plaintiff would exercise its right of eminent domain.").

**The Temporary Right of Entry to Survey That the United States Has Acquired Has No Measurable Market Value**

27. For the reasons discussed above, the right to possess the temporary right of entry to survey Zapata's land has vested with the United States, and their disagreement with the United States' estimated just compensation does not preclude, or somehow defeat, the United States' right to possess this temporary right of entry.  They also may attempt to establish a right to an amount of compensation greater than the estimated just compensation deposited with the Court during the normal course of these proceedings, as they continue.  Because, however, Zapata has accused the United States of acting arbitrarily and of setting a "sham" nominal value of $100, the United States explains how this $100 nominal value is grounded in, and supported by, recognized standards for measuring just compensation.

**The Landowner Has Not Established Any Fair Market Value of the Temporary Right of Entry Acquired By the United States**

28. Under the Fifth Amendment's takings clause, private property may not be taken for a public purpose without "just compensation."  U.S. Const. amend. V.  Just compensation generally means the fair market value of the property when acquired.  *See Kirby Forest Indus.*, 467 U.S. at 10.  Fair market value is typically defined as "what a willing buyer would pay in cash to a willing seller."  *United States v. Miller*, 317 U.S. 369, 374 (1943).

In a federal condemnation action, just compensation is determined by calculating the property's fair market value on the date it was acquired—the "date of taking." *See generally id.*; *United States v. Reynolds*, 397 U.S. 14 (1970). Courts determine the value based on what a hypothetical buyer in the open market would pay a willing seller. *Id.* Generally, for a permanent acquisition, "[t]he best evidence of market value is comparable sales—*i.e.*, sales from a willing seller to a willing buyer of similar property in the vicinity of the taking at or about the same time as the taking." *United States v. 8.41 Acres of Land, More or Less, Situated in Orange County, State of Texas, et al.*, 680 F.2d 388, 395 (5th Cir. 1982) (citations omitted). "Considerations that may not reasonably be held to affect market value are excluded." *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984). Thus, the value that the individual landowner places on a property is not relevant to the valuation inquiry if it is not supported by objective market data. *See U.S. v. 79.20 Acres of Land, More or Less, Situated in Stoddard County, Missouri*, 710 F.2d 1352, 1357 (8th Cir. 1983) (holding that "[a]ny special value to the owner or to the condemnor must be disregarded by the fact-finding body in arriving at fair-market value") (citing *Miller*, 317 U.S. at 375).

29. In the case of a temporary taking like the right of entry to survey that the United States has acquired here, since the property is returned to the owner when the estate taken ends, the just compensation to which the owner is entitled is the value of the United States' limited use of the property during the temporary taking. *See First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 319 (1987) ("Where this burden results from governmental action that amounted to a [temporary] taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of

the use of the land during this period.").  Generally, market rental value is the appropriate measure of compensation for a temporary taking. *Kimball Laundry Co. v. United States,* 338 U.S. 1, 7 (1949).

30. Furthermore, "[t]he burden of establishing the value of the land sought to be condemned remains with the landowner."  *United States v. 62.50 Acres*, 953 F.2d 886, 890 (5th Cir. 1992). *See also United States v. 50.822 Acres of Land, More or Less, In Nueces County, State of Tex.*, 950 F.2d 1165, 1169 (5th Cir. 1992); *8.41 Acres*, 680 F.2d at 394 (citing *United States ex rel. Tennessee Valley Auth. v. Powelson*, 319 U.S. 266 (1943) ("The burden of establishing the value of the lands sought to be condemned is on the landowner")).To date, Zapata has failed to establish the fair market value of the temporary right of entry to survey, or that this limited right of entry even has a measurable market value.  Neither Mr. Zapata nor Mr. Bolton, who Zapata retained for the purposes of this litigation, offer comparable sales of temporary rights of entry for survey purposes, which as explained below, do not exist for these types of temporary rights of entry.  Mr. Bolton acknowledges that such comparable sales are not readily available, and that he has not even researched any such comparable sales.   Zapata and Mr. Bolton also do not identify comparable rents or rental agreements, evidence that the presence of a temporary right of entry for a limited purpose affects a property's sale or rental price, or that this temporary right has any independent sale or rental value.

31. Mr. Bolton does not apply these methodologies to market data to show that these temporary right of entry to survey have a measurable market value, and he offers no opinion of what this (non-existent) market value would be.  Unsupported and conclusory assertions do not establish that these temporary rights of entry have a measurable market value more than

$100.  *See King v. Ames*, 179 F.3d 370, 376 (5th Cir. 1999) ("In general, an owner is competent to give his opinion on the value of his property.  However, such testimony cannot be based on naked conjecture or solely speculative factors.") (internal quotations and citations omitted); *Int'l Paper Co. v. United States*, 227 F.2d 201, 206 n.5 (5th Cir. 1955) (citing *State of Wash. V. United States*, 214 F.2d 33, 45 (9th Cir. 1954) ("Opinion evidence without any support in the demonstration and physical facts, is not substantial evidence.  Opinion evidence is only as good as the facts upon which it is based.")).

**Temporary Rights of Entry to Survey Are Not Comparable To Construction or Hunting Easements**

32. Instead of attempting to demonstrate that temporary rights of entry to survey have measurable market value, Mr. Bolton incorrectly analogizes these rights to construction and hunting easements.  *See,* Bolton Opinion at 8 ("a right of access is equivalent to other temporary easements, such as a temporary construction easements."),  ("it is our opinion that the rights sought by the Government for the right-of-entry for survey . . . essentially equates to a temporary construction easement . . . .").  In attempting to equate construction and hunting easements with rights of entry to survey, Mr. Bolton misconstrues the very limited nature of the temporary right of entry at issue here.

33. Temporary rights of entry to survey do not impact the property in any meaningful way.  The United States has acquired the right to access the subject property to survey, which will entail a survey crew entering on to the property at a time to be determined in consultation with Zapata.  The United States has no right to stage or construct anything on Zapata's property, or to hunt, fish, or otherwise remove wildlife from his property.  Recently, Judge Micaela Alverez discussed the "fundamental differences" between a right

to hunt on a property for a period of time and a temporary right of entry to survey.  In *United States v. 30.00 Acres of Land, and Aleida Flores*, although the Court found evidence of market rental value for the property slightly above the nominal $100, it also explained that "[t]he value of a hunting and fishing lease lies in the lessee's right to enter the property and eventually take fish and game from the property."  2020 WL 4188610, at *7 (July 21, 2020).  Hunting easements are much more extensive than, and therefore not comparable to, the much more limited right of entry to survey, which does not permit anything to be taken from the land.  *See, e.g., United States v. Michoud Indus. Facilities*, 322 F.2d 698, 706 (5th Cir. 1963) (overturning a determination of just compensation based on a comparison of properties that did not "bear any resemblance to each other in the market.").

34.  When taken in context, the sources upon which Mr. Bolton relies further highlight the differences between a temporary construction easement versus a temporary right of entry to survey.  The Uniform Appraisal Standards for Federal Land Acquisitions (Yellow Book) contains standards that, "set forth the guiding principles, legal requirements, and practical implications for the appraisal of property in all types of federal acquisitions."  *Yellow Book* at 3, "Introductory Material."  The Yellow Book instructs appraisers that they "must consider whether the existence of a TCE [Temporary Construction Easement] will restrict the property owner from using the unencumbered portions of the land for its highest and best use during the easement term . . ."  *Yellow Book* at 42, ¶ 1.9.1.  Just compensation for the estate taken is made for the owner's loss, not the taker's gain.  *United States v. General Motors Corporation*, 323 U.S. 373, 378 (1945); *0.073 Acres*, 705 F.3d at 544; *see also Kimball Laundry*, 338 U.S. at 16 ("since the Government for the period of its occupancy of [the property taken] has for all practical purposes preempted [the landowner's activities],

it must pay compensation for whatever transferable value their temporary use may have had."). Again, the temporary right of entry to survey the United States has acquired does not permit the United States to stage construction equipment or materials upon, drive construction equipment across, or hunt or fish on Zapata's property. Zapata has not, and will not, lose the use of this property. The only thing they may not do for the period of one year is exclude the United States from surveying the property. They may still use the property in any other way they choose.

35. Mr. Bolton also incorrectly asserts that the Yellow Book, "equates valuation of a right of entry to that of a temporary construction easement." Bolton Opinion at 6. What Mr. Bolton fails to acknowledge, however, is that the Yellow Book expressly states that rights of entry onto the land for purposes of surveying "are often so short term in nature (sometimes as short as 24 hours) and their purpose so restricted that agencies do not have an appraisal conducted of such properties, but rather they make an administrative determination of a nominal compensation for the acquisition." *Yellow Book* at 42, ¶ 1.9.1, n.72. This is exactly what happened here (and what the United States does, almost without exception, with respect to all other limited rights of entry to survey it acquires). The United States has determined that these temporary rights of entry to survey have no measurable market value, and therefore offered a nominal $100 as just compensation for the temporary and limited right of entry. Temporary rights of entry to survey are similar to temporary construction easements and temporary hunting easements only because they are temporary in nature. Otherwise, rights of entry to survey are much more limited, and do not deprive the landowner, of use of his or her property.

**Applying Recognized Standards for Measuring Just Compensation, Temporary Rights of Entry Have No Measurable Market Value**

36. Contrary to Zapata's, and Mr. Bolton's, unsupported assertions, under recognized standards for measuring just compensation, temporary rights of entry to survey have no measurable market value. As discussed above, just compensation for an acquisition by condemnation is the fair market value of the property acquired, the best evidence of which for a permanent taking is comparable sales. *8.41 Acres*, 680 F.2d at 395. Or, for a temporary taking, the just compensation to which the owner is entitled is the fair rental value for the period for which the United States uses the property. *Kimball Laundry*, 338 U.S. at 7. But temporary rights of entry for survey and investigative purposes do not affect the market value of the subject property. For instance, when a home or landowner sells property, most lenders require a survey and appraisal; however, granting temporary authorization for the property to be surveyed and inspected does not reduce the value and sales price of the property. This lack of measurable market value is attributable to the limitations of the temporary easement acquired; the limitations of this right of entry do not change with, or because of, the characteristics of the property over which this temporary easement is obtained. Exh. 1 (Decl. of R. Jennings), ¶ 2.

37. Available market data does not show a difference in the value of a property burdened with a temporary right-of-entry easement to conduct a survey as compared to a property without such an easement. Mr. Jennings, a licensed real estate appraiser and the Chief Supervisory Review Appraiser with the United States Army Corps of Engineers (USACE), Fort Worth (Texas) District, has analyzed the market value of temporary rights of entry. *Id.*, ¶ 1. As a

result of his analysis, and in his professional opinion, Mr. Jennings has determined that these temporary rights of entry have no measurable market value. *Id*, ¶ 10.

38. Courts repeatedly, and very recently, have accepted Mr. Jennings' opinion as probative of just compensation of temporary rights of entry to survey, and that his testimony is "sufficient substantiation of the $100 nominal compensation." *United States v. 8.903 Acres of Land, More or Less, in Starr County, Tex.*, 2020 WL 4350724, at *5 (July 29, 2020). In *8.903 Acres*, the Court accepted Mr. Jennings' opinion that rights of entry to survey have no measure market value over the proffered opinion of the landowner's appraiser that temporary rights of entry to survey have a measurable market value of thousands of dollars. The Court rejected the landowner's appraiser's calculations, which it "cannot accept . . . as expert testimony or evidence of the value of the property or taking," and held that, [t]he Court previously accepted this evidence [by Mr. Jennings] as probative expert evidence of just compensation, and does so again today." *8.903 Acres,* 2020 WL 4350724 at *6.

39. Mr. Jennings is very familiar with the real estate market in Webb County, having performed 2 appraisals, multiple appraisal reviews, and reviewed a department market study conducted by USACE in this market within the past two years. *Id.*, ¶ 2. As part of his analysis of whether a temporary right of entry has a measurable market value, he researched data regarding USACE acquisitions of temporary rights of entry going back 15 years. *Id.*, ¶ 4. He identified 618 to 655 temporary rights of entry USACE acquired during this period, 533 to 570 of which were acquired for the same project for which the United States is surveying the subject property. *Id*. For each of these temporary rights of entry that had no measurable market value, the United States made an administrative decision to pay no more than a nominal amount of $100. *Id*.

40. Mr. Jennings also interviewed market participants, who each confirmed that temporary rights of entry have no measurable market value.  He spoke to Mr. John Hastings, who has extensive experience in the natural gas and oil industry obtaining temporary rights of entry to survey in Arkansas, Oklahoma, Kansas, Colorado, Wyoming, and Texas.  *Id.*, ¶ 5(b).  Mr. Hastings informed Mr. Jennings that, in his experience, it is not customary to pay for temporary rights of entry to survey, and that any consideration paid for this right is not based on market value because there is no such value associated with them.  *Id*.  Mr. Jennings also spoke to Mr. Johnny Colley, who worked for several oil and gas companies for seven years before joining USACE as a Realty Specialist based in Fort Worth, Texas.  *Id.*, ¶ 5(a).  Mr. Colley estimated that he acquired between 250 and 350 temporary rights of entry to survey during this seven-year period, and did not pay consideration for any of them.  *Id.*

41. In addition, Mr. Jennings reviewed a 2010 appraisal by Mr. Stephen Roach and Cody Knox, attached hereto as Exhibit A to his declaration, which analyzed the same type of temporary right of entry at issue here.  *Id.*, ¶¶ 6-9.  In Mr. Jennings' professional opinion, the methodology used by Mr. Roach and Mr. Knox in their appraisal appears to be complete, to contain adequate supporting information for the conclusions contained therein, and to meet the Uniform Standards of Professional Appraisal Practice and the Uniform Appraisal Standards for Federal Land Acquisitions.  *Id*., ¶ 8.  He also considered that the type of temporary rights of entry were the same, and treated the same, in either market.  *Id.*, ¶ 9.  Accordingly, Mr. Jennings determined that this report is relevant to his analysis of the same type of temporary rights of entry in Texas. *Id.*, ¶¶ 9-10.  The conclusion reached by Mr. Roach and Mr. Knox that temporary rights of entry have no measurable

market value is consistent with Mr. Jennings' analysis, and his experiences with, and understanding of, the value of these temporary rights of entry (or lack thereof). *Id.*, ¶ 7.

42. Because buyers, sellers, and renters of property do not ascribe value to temporary rights of entry such as the one acquired here, it is not surprising there are no comparable sales or market data showing a rental rate for such easements, as prospective purchasers do not typically pay for this right. *Cf. generally Klemic v. Dominion Transmission, Inc.*, 138 F. Supp. 3d 673, 689 (W.D. Va. 2015) (collecting cases showing that the entry on private property for the purposes of surveying and other explorations does not result in a compensable harm). Temporary rights of entry have no measurable market value for which a landowner must be compensated, and no more than a nominal value in just compensation therefore is appropriate.

**The United States' Policy Determination to Pay Compensation of $100 for Temporary Rights of Entry That Have No Measurable Market Value**

*43.* In situations such as this, in which the estate the United States acquires has no discernible market value, it is proper to pay nominal compensation. If a property interest has no fair market value then it is improper to consider non-comparable sales or leases; rather, a nominal amount is given to compensate for infringement on the right to exclude. *See, e.g., Yellow Book* at 42, ¶ 1.9.1, n.72. For example, in *50.822 Acres*, the Fifth Circuit affirmed an award of $100 to each landowner as nominal compensation when the estate acquired through condemnation, a purchase option, had no market value. *50.822 Acres*, 950 F.2d at 1165. The Court held that "it appears that the [landowners] have failed to meet their burden of establishing the value of the opinion. Accordingly, the district court's award of only nominal compensation was not clearly erroneous." *Id.*, at 1169. *See 8.903 Acres of Land,*

2020 WL 4350724, at *6 ("In the absence of any evidence or testimony supporting Defendant's argument that the United States' estimated valuation was too low, the Court will follow its prior precedent and hold that Roger Jennings's testimony is sufficient substantiation of the $100 nominal compensation."); *St. Genevieve Gas Co., Inc. v. Tenn. Valley Auth.*, 747 F.2d 1411 (11th Cir. 1984); *U.S. ex rel. Tenn. Valley Auth. v. A Temp. Right to Enter*, 4:14-CV-085-HSM-SKL, 2017 WL 2559976, at *6 (E.D. Tenn. June 13, 2017) (holding that the landowner was entitled compensation in the nominal amount of $1 for the temporary right of entry to survey). A landowner "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *320.0 Acres of Land*, 605 F.2d at 780.

44. Here, instead of paying $1 in compensation for a temporary right of entry that has no measurable market value, the United States decided, as a matter of policy, to pay compensation of $100. The size, or other characteristics, of the subject property over which the United States has acquired a temporary right of entry for survey purposes is immaterial to the amount of nominal compensation that should be paid. *See, e.g., St. Genevieve Gas Co.*, 747 F.2d at 1411 (rejecting the argument that the amount to be awarded as nominal damages should be based on acreage of the property affected, because the legal entitlements acquired in that acreage were only mineral leases). In taking a temporary right of entry to survey property, the United States has not taken, and the landowner does not lose use of, the underlying property. And the landowner still retains the ability to exclude anyone other than the United States for the limited purpose and time period stated in the Declaration of Taking. Thus, nominal compensation of $100 is more than appropriate for this temporary, limited in scope, right of entry.

Based on the foregoing, the United States submits that it is entitled to the entry of an order of immediate possession and requests that the Court grant this motion and enter an order of possession giving the United States immediate possession of the temporary estate described in Schedule E of the Declaration of Taking (Docket No. 2).

Respectfully submitted,

**RYAN K. PATRICK**
United States Attorney
Southern District of Texas

By:     *s/ John A. Smith III*
**JOHN A. SMITH III**
Assistant United States Attorney
Attorney-in-Charge
Southern District of Texas No. 8638
Texas Bar No. 18627450
One Shoreline Plaza
800 North Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
Telephone: (361) 888-3111
Facsimile: (361) 888-3234
E-mail: john.a.smith@usdoj.gov

Attorney in Charge for Plaintiff

## CERTIFICATE OF SERVICE

I, John A. Smith, Assistant United States Attorney for the Southern District of Texas, do hereby certify that on September 4, 2020, I mailed a true and correct copy of the foregoing document to the all parties.

By:     *s/ John A. Smith III*
**JOHN A. SMITH III**
Assistant United States Attorney

APPENDIX

TABLE OF AUTHORTIES

## Cases

*Constitution Pipeline Co., LLC v. A Permanent Easement for 0.25 Acres*, 2015 WL 12564217, (NDNY Feb. 24, 2015) ........................................................................................... 16

*East Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, (4th Cir. 2004) ....................................... 4, 12

*First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, (1987).................... 18

*Int'l Paper Co. v. United States*, 227 F.2d 201, 206 n.5 (5th Cir. 1955).................................... 20

*Kimball Laundry Co. v. United States,* 338 U.S. 1, (1949) ............................................. 18, 22, 24

*King v. Ames*, 179 F.3d 370, (5th Cir. 1999) ............................................................................. 20

*Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, (1984)........................................ 4, 12, 17

*Klemic v. Dominion Transmission, Inc*., 138 F. Supp. 3d 673, (W.D. Va. 2015) ....................... 27

*St. Genevieve Gas Co., Inc. v. Tenn. Valley Auth.*, 747 F.2d 1411 (11th Cir. 1984).............. 28, 29

*State of Wash. V. United States*, 214 F.2d 33, (9th Cir. 1954).................................................... 20

*Tenn. Valley Auth. v. A Temp. Right to Enter*, 4:14-CV-085-HSM-SKL, 2017 WL 2559976,.... 28

*The United States of America v. 1.04 acres of land, 538 F. Supp. 2d 995* .................................... 6

*TVA v. Powelson*, 319 U.S. 266, (1943) .................................................................................. 2, 19

*U.S. v. 79.20 Acres of Land, More or Less, Situated in Stoddard County, Missouri*, 710 F.2d 1352, (8th Cir. 1983) ............................................................................................................ 18

*United States v. 0.073 Acres of Land (*Mariner's Cove*)*, 705 F.3d 540, (5th Cir. 2013)................ 2

*United States v. 0.35 Acres of Land, More or Less, Situate in Hidalgo County, State of Texas, et al.* ...................................................................................................................................... 14

*United States v. 1.04 Acres of Land, More or Less, Situate in Cameron County, Texas*, 538 F.Supp.2d 995, (S.D. Tex. 2008).......................................................................................... 15

*United States v. 30.00 Acres of Land, and Aleida Flores* ........................................................... 21

*United States v. 320.0 Acres of Land, et al.*, 605 F.2d 762, 822 n.134 (5th Cir. 1979).......... 13, 28

*United States v. 50 Acres of Land*, 469 U.S. 24, (1984) .............................................................. 17

*United States v. 50.822 Acres of Land, More or Less, In Nueces County, State of Tex.*, 950 F.2d 1165, (5th Cir. 1992) ...................................................................................................... 19, 27

*United States v. 62.50 Acres*, 953 F.2d 886,  (5th Cir. 1992) .................................................... 19

*United States v. 8.41 Acres of Land, More or Less, Situated in Orange County, State of Texas, et al.*, 680 F.2d 388, (5th Cir. 1982) ............................................................................ 17, 19, 23

*United States v. 8.903 Acres of Land, More or Less, in Starr County, Tex.*, 2020 WL 4350724, (July 29, 2020) ........................................................................................... 24, 25, 28

*United States v. Causby*, 328 U.S. 256, (1946) ........................................................................ 2

*United States v. General Motors Corporation*, 323 U.S. 373, (1945) .................................... 22

*United States v. Michoud Indus. Facilities*, 322 F.2d 698, (5th Cir. 1963) ........................... 21

*United States v. Miller*, 317 U.S. 369, (1943) ................................................................... 17, 18

*United States v. Reynolds*, 397 U.S. 14 (1970) ..................................................................... 17

*Zapata County v. Trump* ......................................................................................................... 2

**Statutes**

§ 4651 .................................................................................................................................... 13

15 U.S.C. § 717f .................................................................................................................... 15

40 U.S.C.  3114 ..................................................................................................................... 11

40 U.S.C. § 3114(b) .......................................................................................................... 4, 11

40 U.S.C. § 3114(c) ............................................................................................................... 12

42 U.S.C. § 4602 ................................................................................................................... 12

42 U.S.C. § 465 ....................................................................................................................... 9

42 U.S.C. § 4651 ................................................................................................................... 12

U.S.C. § 1103 ........................................................................................................................ 13

U.S.C. § 1103(b) ................................................................................................................... 13

**Other Authorities**

*Uniform Appraisal Standards for Federal Land Acquisitions* (*Yellow Book*) .............. 2, 19, 20, 24